ORIGINAL

LEONARDO M. RAPADAS
United States Attorney
MARIVIC P. DAVID
Assistant U.S. Attorney
Suite 500, Sirena Plaza
108 Hernan Cortez Ave.
Hagåtña, Guam 96910
Tel: (671) 472-7332/7283
Fax: (671) 472-7334

Attorneys for the United States of America

**FILED**
DISTRICT COURT OF GUAM

SEP 2 9 2006

**MARY L.M. MORAN**
**CLERK OF COURT**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| ERICK WOTULO, | ) |
| | ) |
| Defendant. | ) |

MAGISTRATE CASE NO. **06 - 00020**

**UNITED STATES' APPLICATION TO SEAL EXHIBITS A AND B**

COMES NOW the United States moves this Honorable Court for an order sealing Exhibits A and B, in the above-entitled case, for the reason that the record has been sealed in the District of Maryland, under Criminal Case No. CCB-06-0416.

Respectfully submitted this 29th day of September, 2006.

LEONARDO M. RAPADAS
United States Attorney
Districts of Guam and NMI

By: _____
MARIVIC P. DAVID
Assistant U.S. Attorney

# SEALED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA

v.

HANIFFA BIN OSMAN
ERICK WOTULO and
HAJI SUBANDI

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

CRIMINAL NO.

CCB-06-0416

Conspiracy to Export Arms
and Munitions, 18 U.S.C.
$371 and 22 U.S.C.
$2778; Conspiracy to Provide
Material Support to a
Foreign Terrorist
Organization, 18 U.S.C.
$2339B(a)(1); Money
Laundering 18
U.S.C. $1956(a)(2)(A);
Aiding and
Abetting 18 U.S.C.$2)

...oooOooo...

### INDICTMENT

The Grand Jury for the District of Maryland charges
that:

### Preliminary Allegations

1.  At all times relevant to this Indictment:

a) Heckler and Koch was an incorporated business having
offices in the United States at Trussville, Alabama. Heckler and
Koch and its associated businesses are engaged in the
development, manufacture, sale and distribution of firearms and
components for military, law enforcement and recreational
applications. These firearms and components include the H&K Model
69 40mm grenade launcher and MP 7 machine gun.

GOVERNMENT
EXHIBIT

A

b) FNH/USA LLC. was a business organized in the United States, with offices at McLean, Virginia. FNH/USA LLC. and its associated businesses are engaged in the development, manufacture, sale and distribution of firearms and components for military and law enforcement applications. These firearms and components include the P90 5.7x28mm triple rail machine gun and Five-Seven 5.7x28mm pistol.

c) Colt Defense LLC. was a business organized in the United States, with offices at West Hartford, Connecticut. Colt Defense LLC. and its associated businesses are engaged in the development, manufacture, sale and distribution of firearms and components for military, law enforcement and recreational applications. These firearms and components include the M16A4 5.56mm machine gun.

d) The Raytheon Company was a business incorporated in the United States with offices at Waltham, Massachusetts. The Raytheon Company and its subsidiaries are engaged in the development, manufacture, sale and distribution of assorted weaponry for military applications. Among the weapons developed by Raytheon exclusively for military use is the Stinger, a shoulder fired surface to air missile, which is designed to destroy aircraft in flight.

e) The United States Marine Corps is a component of the United States Department of Defense. In addition to its

2

obligations as part of the armed forces of the United States, it develops, manufactures and distributes specialty firearms for military and law enforcement use. One such specialty firearm is the M40A3 Sniper rifle.

f) ITT Corporation was a business incorporated in the United States with offices at White Plains, New York. ITT Corporation and its subsidiaries are engaged in the development, manufacture, sale and distribution of night vision technology for military applications. ITT Corporation develops and manufactures the F7201 PVS-14 Generation 3 night vision equipment.

g) **HAJI SUBANDI** and **ERICK WOTULO** are citizens of the Republic of Indonesia.

h) **HANIFFA BIN OSMAN** is a citizen of the Republic of Singapore.

i) United States Immigration and Customs Enforcement was operating an undercover business within the State of Maryland.

## The Export and Import of Defense Articles

2. The export from, and import into, the United States of arms, munitions, equipment for military use, and related components, and the technology to build such items, is strictly controlled by statutes and regulations.

3. The Arms Export Control Act authorizes the President of the United States to control the import and export of defense

3

articles and services in furtherance of world peace, security and foreign policy of the United States. It authorizes the Secretary of State to make decisions on whether license applications or other written requests for the import or export of defense articles and services should be permitted. (61 FR 48831, September 17, 1996)

4. The Arms Export Control Act, Title 22, United States Code, Section 2778, and the International Traffic in Arms Regulations (the ITAR), Title 22, Code of Federal Regulations, Part 120, authorize the United States Department of State's Directorate of Defense Trade Controls ("the DDTC") to establish the United States Munitions List ("the Munitions List") to regulate the import and export of defense articles and services.

5. The Munitions List is a catalog of designated "defense articles" which are subject to certain export and import restrictions. Any person who intends to export, or import temporarily, defense articles on the Munitions List from or into the United States is first required to obtain a license from the DDTC. An applicant for an export or temporary import license from the Department of State must identify in the required license application the ultimate and final destination of the goods, which in the trade is referred to as the "end user."

4

6. Included on the Munitions List are assorted classifications of conventional weapons, ammunition, missiles and night vision devices.

7. At all times material to the Indictment herein, the P90 5.7x28mm triple rail machine gun; Five-Seven 5.7x28 pistol; MP7 machine gun; H&K Model 69 40mm grenade launcher; M16A4 5.56mm machine gun; M40A3 7.62 Sniper rifle; Stinger shoulder fired surface to air missiles; and Model F7201, PVS-14 Generation 3 night vision goggles were all defense articles on the Munitions List, which required licenses from the United States Department of State's Directorate of Defense Trade Controls, before they could be temporarily imported into or exported from the United States.

8. The export of any Munitions List item to customers in the Democratic Socialist Republic of Sri Lanka requires a license from the DDTC.

## International Emergency Economic Powers Act

9. On September 23, 2001 the President of the United States of America, acting by Executive Order pursuant to the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1701 et seq., declared a national emergency with respect to the threat of further terrorist attacks in the aftermath of September 11, 2001. Executive Order No. 13224, dated September 23, 2001 and published in the Federal Register, found

5

that the continuing and immediate threat of further attacks on United States nationals or the United States constituted an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. Executive Order 13224 created a broad prohibition on transactions which assist, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of acts of terrorism and blocked all property and interests in property located in the United States of persons found to be in violation of the stated prohibitions.

## The Liberation Tigers of Tamil Eelam and Its Designation as a Foreign Terrorist Organization

10. The government of the Democratic Socialist Republic of Sri Lanka has been involved in an armed conflict with an organized group within its borders since approximately 1983. This organized group, the Liberation Tigers of Tamil Eelam (hereinafter "LTTE" or Tamil Tigers), was founded in 1976 and controls most of the northern and eastern coastal areas of Sri Lanka.

11. The LTTE has advocated the violent overthrow of the elected government of Sri Lanka as well as the creation of a separate state for the Tamil population in northern Sri Lanka. The LTTE has regularly engaged in acts of violence against the Sri Lankan government, including the use of 'suicide bombings' against both

6

civilian and military targets. Approximately two hundred such attacks have been attributed to the LTTE to date.

12. The LTTE is highly organized and contains components responsible for political activities, intelligence, operations and procurement. The LTTE relies heavily upon supporters throughout the world to raise and launder money, acquire intelligence, purchase military use technology and equipment and otherwise support its activities.

13. The LTTE has been designated by the United States Department of State as a Foreign Terrorist Organization since 1997. As a result of said designation, the LTTE cannot legally raise money or procure operational equipment or other materials in the United States. Individuals involved in these activities or other forms of material support are subject to prosecution under 18 U.S.C. Section 2339B and related statutes.

<u>HAJI SUBANDI</u>

14. **HAJI SUBANDI** is an Indonesian citizen who corresponded regularly with the undercover business in an effort to secure military use equipment and technology from businesses located within the United States. Between March 2004 and April 2006, **SUBANDI**, on numerous occasions, requested from the undercover business, via electronic mail and telephone facsimile, price quotations and technical specifications for items suitable for military use, including items listed on the United States

7

Munitions List. These items included night vision goggles, special forces weaponry and equipment, communication devices, spare parts for helicopters and military aircraft, sonar technology, unmanned aerial vehicles as well as conventional arms and munitions. The "end users" of these items were located in such countries as the Republic of Indonesia and the Democratic Socialist Republic of Sri Lanka.

15. In communicating with the undercover business, **HAJI SUBANDI** expressed his willingness to dispense with and to subvert the licensing requirements of the United States Department of State for the export of items contained on the Munitions List. **SUBANDI** also expressed his desire to conduct arms transfers "by the back door" and that he was willing to assumes the risks of such conduct, even if it meant going to jail.

**COUNT I**

**The Conspiracy to Violate the Arms Export Control Act**

16. From in or about April of 2006 through the date of this Indictment, in the District of Maryland, the Democratic Socialist Republic of Sri Lanka, the Republic of Indonesia and elsewhere,

**HAJI SUBANDI, HANIFFA BIN OSMAN and ERICK WOTULO**

the defendants herein, did knowingly and willfully combine, conspire, confederate and agree with each other, and with others, known and unknown to the Grand Jury, to willfully export and cause to be exported from the United States to the Democratic

8

Socialist Republic of Sri Lanka, defense articles listed on the United States Munitions List, without having first obtained from the Department of State, Directorate of Defense Trade Controls, a license or other written authorization for such export, in violation of Title 22, United States Code, Sections 2778(b)(2) and (c), and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 127.1(a), 127.1(d) and 127.3.

## The Object of the Conspiracy

17. It was an object of the conspiracy to export from the United States state-of-the-art firearms, machine guns and ammunition, surface to air missiles, night vision goggles and other Munitions List items to customers located outside the United States, including the LTTE, a designated Foreign Terrorist Organization operating within the Democratic Socialist Republic of Sri Lanka, directly or through intermediary countries in violation of the International Emergency Economic Powers Act, and the shipment of the aforementioned items to customers without obtaining the appropriate license from the United States Department of State, Directorate of Defense Trade Controls, in violation of the Arms Export Control Act.

## The Manner and Means of the Conspiracy

18. It was part of the conspiracy for the defendants to act as brokers and middlemen between manufacturers and distributors of technology produced for military use and to military

9

specifications, and purchasers of such technology. The purchasers, or "end users," of this technology were individuals and/or entities located within the Democratic Socialist Republic of Sri Lanka, specifically the LTTE, and elsewhere.

19.  It was further part of the conspiracy that **HAJI SUBANDI**, **HANIFFA BIN OSMAN** and **ERICK WOTULO**, and other unindicted co-conspirators, made extensive use of telephones, telephone facsimiles and electronic mail to seek price quotes for items parts and equipment suitable for military applications, including Munitions List items, and to negotiate for the acquisition of such items for eventual delivery to members of the LTTE, a designated Foreign Terrorist Organization, said organization being the "end user" operating within the Democratic Socialist Republic of Sri Lanka.

Overt Acts

20.  In furtherance of the conspiracy and to effect its unlawful purpose, defendants **HAJI SUBANDI, HANIFFA BIN OSMAN** and **ERICK WOTULO**, and others committed and caused to be committed the following acts in the District of Maryland, and elsewhere, among others:

a) On or about April 27, 2006, **HAJI SUBANDI** contacted the undercover business via electronic mail and inquired about a sale of military use weapons to an organization that **SUBANDI** reported

10

to be the Liberation Tigers of Tamil Eelam. (LTTE) Subsequently, **SUBANDI** referred to this organization as "TT".

b) On or about May 3, 2006, **HAJI SUBANDI** contacted the undercover business via electronic mail and sent an itemized list of some fifty-three military use items, including sniper rifles, machine guns, and grenade launchers that he wished to acquire for the LTTE.

c) On or about May 5, 2006, **HAJI SUBANDI** contacted the undercover business via telephone facsimile and recounted the events of a recently concluded meeting with two LTTE rebels and an Indonesian liaison named Major General **ERICK WOTULO**. **SUBANDI** wrote that the LTTE requested immediate pricing for numerous military use equipment and weaponry. **SUBANDI** further noted the terms of payment for the requested items and noted that the LTTE insisted on delivery of the weapons to a location in international waters.

d) On or about May 5, 2006, **HAJI SUBANDI** contacted the undercover business via telephone facsimile and provided the identity of a Sri Lankan member of a team which would inspect the weapons prior to delivery.

e) On or about May 6, 2006, **HAJI SUBANDI** contacted the undercover business via telephone facsimile and represented the identity of second member of a team which would inspect the

11

weapons for the LTTE to be an individual named **HANIFFA BIN OSMAN**.

**SUBANDI** also stated that a high ranking LTTE representative had requested the undercover agent and **SUBANDI** to travel to Kuala Lumpur, Malaysia to further discuss the matter of the arms acquisitions and to arrange payment via cash or offshore bank account transfers.

f) On or about May 6, 2006, **HAJI SUBANDI** contacted the undercover business via telephone facsimile and identified **HANIFFA BIN OSMAN** and Major General **ERICK WOTULO** as representatives of the LTTE who were willing to travel to a United States Territory to meet with undercover agents.

g) On or about May 9, 2006, ICE undercover agents, at the request and direction of **HAJI SUBANDI**, sent via electronic mail pricing information for assorted military use technology and weaponry sought by the LTTE. The items included sniper rifles, submachine guns with suppressors and grenade launchers.

h) On or about May 15, 2006, **HAJI SUBANDI** contacted the undercover business via electronic mail and sought guidance on how to include his profit in the proposed sale price tendered to the LTTE.

I) On or about May 18, 2006, **HAJI SUBANDI** contacted the undercover business via electronic mail and reported that LTTE representatives in Kuala Lumpur, Malaysia sent **HANIFFA BIN OSMAN**

12

to Colombo, Sri Lanka to report to LTTE superiors the details of the ongoing negotiations for the acquisition of the military items and weaponry.

  j) On or about May 24, 2006, **HAJI SUBANDI** contacted the undercover business via electronic mail and reported that **HANIFFA BIN OSMAN** had requested delivery of the proposed weapons be conducted in international waters 200 km from Sri Lanka.

  k) On or about May 26, 2006, **ERICK WOTULO** contacted the undercover business via electronic mail and identified himself as a retired Indonesian Marine Corps General. **WOTULO** discussed the proposed weaponry acquisitions by the LTTE and stated, in substance and in part, "I understood this business is dangerous, also extraordinary, high risk".

  l) On or about June 5, 2006, **ERICK WOTULO** contacted the undercover business via telephone and electronic mail and stated that he and his associates were preparing a purchase order for the weapons. **WOTULO** stated that the chief of the LTTE had requested that he and **HANIFFA BIN OSMAN** travel to Baltimore, Maryland to meet with undercover agents.

  m) On or about June 6, 2006, **ERICK WOTULO** contacted the undercover business via electronic mail and referenced a telephone call he had participated in with an undercover agent on June 5, 2006. **WOTULO** confirmed the content of the conversation

13

and reaffirmed the need to provide the undercover agents with a 25% deposit before the weapons purchase could proceed.

n) On or about June 6, 2006, **ERICK WOTULO** contacted the undercover business via electronic mail and submitted a purchase order for nine Munitions List items totaling approximately $3,000,000 (USD). The items included M40A3 sniper rifles, FN P90 submachine guns with suppressors and M203 grenade launchers.

o) On or about June 7, 2006 undercover agents spoke to **HANIFFA BIN OSMAN** and discussed meeting in Baltimore, Maryland and payment terms for the proposed arms sale.

p) On or about June 7, 2006, **HAJI SUBANDI** contacted the undercover business via electronic mail and informed undercover agents that the LTTE is a terrorist organization. **SUBANDI** further wrote, in substance and in part, "The LTTE is sealed off by the US Government and the EU 25 countries as terrorist".

q) On or about June 13, 2006, **HAJI SUBANDI** contacted the undercover business via electronic mail and wrote that "in addition the TT should pay my round trip ticket. If I have to come to Baltimore, they have to pay my business class ticket. My preference is still G." (Guam)

r) On or about June 16, 2006, **HANIFFA BIN OSMAN** contacted the undercover business via electronic mail and wrote that he intended to visit Jakarta, Indonesia to meet **ERICK WOTULO** for the

14

purpose of finalizing arrangements for a meeting with undercover agents and to make an initial payment for the weaponry.

s) On or about June 27, 2006, **HAJI SUBANDI** contacted the undercover business via electronic mail and wrote that the LTTE had accepted price quotations provided by the undercover business for the purchase of the Munitions List weaponry.

t) On or about July 4, 2006, **HANIFFA BIN OSMAN** contacted the undercover business via electronic mail and agreed to meet with undercover agents in Baltimore. **OSMAN** requested that undercover agents keep the fact of the meeting confidential for security reasons.

u) On or about July 26, 2006, **HANIFFA BIN OSMAN** traveled to Baltimore, Maryland to meet with undercover agents to further the purchase of the weaponry. During an initial meeting **OSMAN** stated that the weapons were for the LTTE from Sri Lanka. He further stated that he was not a member of the LTTE but assisted them in obtaining what they needed. **OSMAN** was shown a number of weapons, ammunition and night vision devices.

v) On July 27, 2006, **HANIFFA BIN OSMAN** met with undercover agents in Maryland and discussed the illegality of the transfer of the arms to the LTTE. **OSMAN** provided navigational coordinates for a delivery in the Indian Ocean. **OSMAN** asked about serial numbers on the weapons in the event they fell into the hands of

15

the Sri Lankan Army. **OSMAN** stated that if the first transfer of the Munitions List items were successful, the second order could be worth as much as $15,000,000. **OSMAN** also inquired about pricing for Unmanned Aerial Vehicles that were displayed to him.

w) On July 28, 2006, **HANIFFA BIN OSMAN** test-fired in Maryland several of the weapons, including machine guns and sniper rifles, which he sought to secure for the LTTE.

x) On July 31, 2006, **HANIFFA BIN OSMAN** met with undercover agents and discussed the commission he would receive for the arms sale. **OSMAN** stated that his partner would inspect the weapons and travel on the boat to the delivery point. **OSMAN** also raised the possibility that members of the SEA TIGERS, the Marine Unit of the LTTE, would also escort the weapons to their final destination.

y) On or about August 1, 2006, **HANIFFA BIN OSMAN** informed the undercover agents that the LTTE sent a deposit of $250,000 via international wire transfer as a down payment for the purchase of the weapons, and that the value of the arms sale had increased to $900,000.

z) On or about August 2, 2006, **HANIFFA BIN OSMAN** informed undercover agents that the company that had wired the money was controlled by a member of the LTTE. This company was also

16

reported to be utilized to provide a range of services to the LTTE.

aa) On or about August 2, 2006, an international wire transfer from Account Number 601-00000-61000012 maintained at the Eon Bank Berhad in Kuala Lumpur, Malaysia in the amount of $250,000.00, more or less, was credited to an account maintained by the undercover business in Maryland.

bb) On or about August 5, 2006, **HANIFFA BIN OSMAN** contacted the undercover business via electronic mail and provided undercover agents with passports in the names of **HANIFFA BIN OSMAN** and his associate in preparation for their travel to the Northern Mariana Islands to accept delivery of the weapons destined for the LTTE.

cc) On or about August 18, 2006, **HANIFFA BIN OSMAN** contacted the undercover business via electronic mail and inquired about the purchase of surface to air missiles for use by the LTTE against the Sri Lankan Air Force.

dd) On or about August 20, 2006, **HANIFFA BIN OSMAN** contacted the undercover business via electronic mail and confirmed his willingness to travel to the Northern Mariana Islands to accept delivery of the weapons destined for the LTTE.

ee) On or about August 27, 2006, **HANIFFA BIN OSMAN** contacted the undercover business via electronic mail and requested, on behalf

of "his headquarters," photographs and technical specifications for the surface to air missiles.

18 U.S.C. Section 371

22 U.S.C. Section 2778

## Count II

### Conspiracy To Provide Material Support Or
### Resources To A Foreign Terrorist Organization

The Grand Jury for the District of Maryland further charges that:

1. The Grand Jury for the District of Maryland incorporates repeats and re-alleges Paragraphs 1 through 15 as alleged in Count I as if fully set out herein.

2. From in or about April of 2006 through the date of this Indictment, in the District of Maryland, the Democratic Socialist Republic of Sri Lanka, the Republic of Indonesia and elsewhere,

**HAJI SUBANDI, HANIFFA BIN OSMAN, and ERICK WOTULO**

the defendants herein, did knowingly combine, conspire, confederate and agree with each other, and with others, known and unknown to the Grand Jury, to knowingly provide material support and resources, as said terms are defined in 18 U.S.C. Section 2339A(b)(1), including firearms, ammunition, missiles and other items suitable for military use, to a foreign terrorist organization, to wit the Liberation Tigers of Tamil Eelam (LTTE), which has been designated by the Secretary of State as a foreign terrorist organization since 1997, pursuant to Section 219 of the Immigration and Nationality Act, in violation of 18 U.S.C. Section 2339B.

19

## The Object of the Conspiracy

It was a part and an object of the conspiracy to enrich the defendants by providing state of the art firearms, machine guns and ammunition, surface to air missiles, night vision goggles and other Munitions List items to the LTTE, and its members and associates operating within the Democratic Socialist Republic of Sri Lanka, to be used to fight against forces of the elected government of the Democratic Socialist Republic of Sri Lanka.

## The Manner and Means of the Conspiracy

(a) It was part of the conspiracy for the defendants to act as brokers and middlemen between manufacturers and distributors of technology produced for military use and to military specifications, and purchasers of such technology. The purchasers, or "end users," of this technology was the LTTE, its members and associates, operating within the Democratic Socialist Republic of Sri Lanka.

(b) It was further part of the conspiracy that **HAJI SUBANDI**, **HANIFFA BIN OSMAN** and **ERICK WOTULO**, and other unindicted co-conspirators, made extensive use of telephones, telephone facsimiles and electronic mail to seek price quotes for items parts and equipment suitable for military applications, including Munitions List items, and to negotiate for the acquisition of such items for eventual delivery to members of the LTTE, a

20

designated Foreign Terrorist Organization, said organization being the "end user" operating within the Democratic Socialist Republic of Sri Lanka.

Overt Acts

In furtherance of the conspiracy and to effect its unlawful purpose, defendants **HAJI SUBANDI, HANIFFA BIN OSMAN** and **ERICK WOTULO**, committed and caused to be committed the following acts in the District of Maryland, and elsewhere, among others:

The Grand Jury for the District of Maryland repeats and re-alleges each Overt Act set forth in Paragraph 20 as alleged in Count I of this Indictment as if fully set out herein.


18 U.S.C. § 2339B (a)(1)

18 U.S.C. § 2339A(b)(1)

21

## COUNT III

The Grand Jury for the District of Maryland further charges that:

1. The Grand Jury for the District of Maryland incorporates Paragraphs 1 through 15 as alleged in Count I as if fully set out herein.

2. On or about August 2, 2006, in the District of Maryland, Malaysia, the Democratic Socialist Republic of Sri Lanka and elsewhere, the defendants,

**HAJI SUBANDI, HANIFFA BIN OSMAN, and ERICK WOTULO**

did knowingly and willfully transmit and transfer funds, that is $250,000.00, more or less, from a place outside the United States, that is, Malaysia, to a place in the United States, that is Baltimore, Maryland, with the intent to promote the carrying on of specified unlawful activity, that is the unauthorized

22

acquisition of articles controlled on the United States Munitions List, established under Section 38 of the Arms Export Control Act, and to provide material support to a designated terrorist organization (22 U.S.C. § 2778 and 18 U.S.C. § 2339B).

18 U.S.C. Section 1956(a)(2)(A)
18 U.S.C. Section 2

TRUE BILL:

Rod J. Rosenstein
United States Attorney

Foreperson

9-19-2006
Date

I hereby attest and certify on 9-19-06
that the foregoing document is a full, true and correct
copy of the original on file in my office and in my
legal custody
FELICIA C. CANNON
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND

By Claudia Gibson Deputy

23

# United States District Court
# District of Maryland

**UNITED STATES OF AMERICA**

**WARRANT FOR ARREST**

v.

**ERICK WOTULO**

Case No. **CCB-06-0416**

**TO:** **The United States Marshal and any Authorized United States Officer**

YOU ARE HEREBY COMMANDED to arrest   **ERICK WOTULO**
                                      *Name*

and bring him/her forthwith to the nearest magistrate judge to answer a(n)

☒ Indictment ☐ Information ☐ Complaint ☐ Order of Court ☐ Violation Notice ☐ Probation Violation Petition

charging him or her with *(brief description of offense)*:Conspiracy to Export Arms & Munitions; Conspiracy to Provide Material Support to a Foreign Terrorist Organization; Money Laundering; Aiding & Abetting

in violation of Title _____18_____ United States Code, Section(s) 371,2339B(a)(1),1956(A)(2)(a),2

_____Felicia C. Cannon_____                              _____Clerk, U.S. District Court_____
Name of Issuing Officer                                 Title of Issuing Officer

*Agnes M. Tinney*                                       _____September 19, 2006     Baltimore, MD_____
(By) Deputy Clerk                                       Date and Location

Bail fixed at $ NONE RECOMMENDED                        by  Paul W. Grimm, U.S. Magistrate Judge
                                                        Name of Judicial Officer

| RETURN |
|---|
| This warrant was received and executed with the arrest of the above-named defendant at _____ |

| Date Received | Name and Title of Arresting Officer | Signature of Arresting Officer |
|---|---|---|
| Date of Arrest | | |



GOVERNMENT EXHIBIT
*B*

U.S. DISTRICT COURT (Rev. 12/1999) - Bench Warrant